The next matter, number 241705, State Teachers Retirement System of Ohio v. Charles River Laboratories International, Inc., et al. At this time, would the counsel for the appellant please introduce himself on the record to begin? Yes, may it please the Court, Matthew Wessler for the plaintiff's appellant. With the Court's permission, I'd like to reserve two minutes for rebuttal. You may. Thank you. To assess whether a company's statements are either false or misleading, a court must ask what a reasonable investor would think about hearing those statements. In this case, shortly after the Department of Justice publicly disclosed that it had indicted a major international primate smuggling ring, Charles River rushed to assure its investors that the indicted group was not one of its suppliers of long-tailed macaques. Shortly after the indictment dropped, Charles River's CEO attended an investor conference where, in response to specific questions about the impact that this would have on the company's supply situation, he pledged that the target of the indictment was, quote, not a supplier of ours. And he backed that up by assuring investors that, quote, all of the company's Cambodian suppliers were high quality. So although the indictment might, again I'm quoting, hurt some folks, it would have no real short-term impact on Charles River. These assurances followed on the heels of Charles River's repeated statements in the run-up to the DOJ indictment that it was not relying on any suspect macaque suppliers, what it called non-preferred suppliers or non-preferred vendors, to meet its heavy demand. But none of these statements were true. Not only had Charles River implied— Can you just help me answer the question of how we should construe what non-preferred means, or at least what a reasonable investor would think that means? Sure. So I think the complaint lays out, at least at a plausible level, that non-preferred, and this was backed up by Charles River's CEO's statements about the kinds of vendors that he preferred or not preferred to use, but non-preferred means vendors where they cannot credibly recognize the integrity of the supply chain. So what he said, and this is at J123, is that he described brokers that Charles River, quote, prefers not to use as those who, quote, get animals from wherever, and don't, and again I'm quoting J123, don't care where the animals come from. So that's really crucial in this case. It's not just a kind of ethical concern about where these macaques are coming from, but it fundamentally means that the purpose of these macaques, which are being sold to American scientific research institutes, cannot use macaques that are not purpose-bred, bred intentionally in a facility and not caught in the wild. And when he's using that term, we prefer not to use vendors who get their macaques from anywhere, he's specifically referring to two or maybe three companies that Charles River is in fact using as part of its supply chain. Those companies are Invigo and Orient, as well as KF Cambodia. And all three of those suppliers, and there's no dispute that Charles River was receiving supply from all three of those suppliers, all three of them had significant problems in the way that they were sourcing their macaques. For KF Cambodia, we know that that's true as the complaint alleges, that the U.S. Fish and Wildlife had actually seized a shipment from that supplier that was directed to Charles River. The only basis for a seizure by the U.S. Fish and Wildlife is if there's a suspicion that there is illegal trafficking that's going on as a way that these macaques have been caught. And for Invigo and Orient, the two other non-preferred suppliers, both of those companies were under criminal investigation. One of the executives of those companies, one of the executives of Orient, had in fact already been indicted for lying during the international smuggling trafficking investigation. And so we think the complaint links up this concept of non-preferred vendors with this idea that what's going on is, and Charles River is telling investors and the public, we have a highly demanding way that we vet our suppliers. None of our suppliers are suffering from any of these problems. There is integrity in our supply chain when in fact the opposite is true. Not only are these non-preferred vendors for years being used to source Charles River's macaques, but also that's on one side. On the other side, there is this international primate smuggling ring that the DOJ has indicted, and fully a quarter of Charles River's macaques are coming from that indicted smuggling ring. And so you have, I think, on both sides of this case, both when it comes to the statements that Charles River is telling investors about its connection with the Vanny Group supply chain, and then also its use of non-preferred vendors, it is telling the public and investors one thing, and what it knows and what's happening behind the scenes is entirely different. How do you propose that we deal with one of the other statements that Charles River made, is that they're operating under the expectation that for some time period, supply of Cambodia-sourced NHPs will be difficult to obtain in the United States. And I think they make another statement that does suggest they're going to have some trouble getting macaques. I grant you that there are some generic statements that the company is making about how, generally speaking, there might be some challenges with Cambodian macaque supply. But they are making, at the same time, making specific statements that indicate to a reasonable investor that those problems are either not occurring currently for Charles River, even though they might be affecting other suppliers, and not just that they're not occurring, but also that they only might occur in the future. And so I don't think that those generic statements can overcome the specific language that Charles River is using to communicate to investors that it is not suffering any actual problems. And one of those examples should be specific about it. At the investor conference in which Charles River CEO gives this wide-ranging interview about the potential effect that this indictment is going to have on the market generally, on Charles River specifically, he says, and again I'll just quote, he says, this is not, there's no real short-term problem for us. So he is telling investors, even though at a general level there will be challenging conditions in the supply of macaques, we are not going to face any of those problems because we have a supply chain that has integrity, because we have vetted everybody in it, and we don't have any relationship with any of the legally suspect macaque suppliers. Not only that, Judge Kayada, but I think there's another key fact here, which is, at the same time, the company is making these statements about no real short-term impact, or, you know, we won't be affected. It knows that one of its shipments has, in fact, already been seized by the U.S. Fish and Wildlife. That happened, I think, two months before the CEO got up and made these comments at the investor conference. And all the while, it's using the word may as a way to indicate that there might be some future problem. That is, a future problem may be enough to allow a company to escape allegations in a complaint like this, where there isn't specific evidence either that that was already currently happening or was imminent, like in this court's decision in Carth. But I think Carth is really helpful here in illustrating the distinction between a statement about something that might happen in the future without any clear indication that there are present problems or past problems, and a situation like this one, where at the same time the company is saying, look, there might be some future challenges, it knows, number one, that those supply chain disruptions have already happened because of the KF shipment seizure, and two, that it is relying fully a quarter of its macaques come from the indicted smuggling ring that is at the heart of the DOJ investigation. And I don't think at any level, at least at the pleading stage, we're in a position where it would be implausible for a reasonable investor who is hearing those specific statements from the CEO to think, oh, in fact, actually, you know, it already is experiencing these problems or, you know, it in fact has some kind of relationship with the DOJ banning group smuggling ring. And in fact, if I could just make this one last point, not only do investors not think that, but there's evidence in the complaint that they thought the opposite. So, you know, what we know is a few weeks, I think, after, excuse me, a few weeks after the CEO makes his statements, investors, analysts, UBS analysts, Evercore analysts, understand the CEO to be saying we have no relationship whatsoever with the banning group. So this court has held in CVS that expert analysts, what they understand is an indication of what a reasonable investor would know. And I think that here demonstrates at least the plausibility that a reasonable investor would know. This is what the company is saying is not in fact the case. Is the untoward event here, the complaints theory that's being misrepresented or covered up, should we read it as is it the unavailability of macaques or is it the getting caught up in a criminal investigation? It's, I may have misheard your question. It's the latter. It's getting caught up in this investigation. That's what investors are really worried about. What they're worried about is, look, do you, are you going to either be caught up in the investigation or lose your supply? Both of those things matter. But what the company spends most of its time trying to assure investors about is our supply chain has integrity. There is nothing about the way in which we are sourcing our macaques that has us even remotely connected with the indicted supply chain. Because they don't quite say we're not remotely connected. They say we're not directly connected. Well, I think they say more than that. I mean, that is one, the company puts out a 10K statement where it focuses on this direct connection language. But the key is that shortly after that, and this is within 10 days of the DOJ indictment, the CEO gets up at an investor conference and he drops the adjective direct. He's very clear. He says they are, quote, not a supplier of ours. There is no cabining of that statement. He's using it to convey the distinct impression that the entire group is disconnected from the company's supply chain. And that is just fundamentally not the case. If I could spend just maybe just one more minute on the way the district court understood this allegation, because the district court, I think, picked up on this idea that, you know, by using the adjective direct, at least when it came to the 10K, that that somehow could never, as a matter of law, could not be understood to be either fraudulent or misleading. But even if you accept that that is the only statement the company made and you carve out from the complaint the language that the CEO is using about just not a direct, not a supplier of ours at all, if you look at the complaint, it does not indict any one company. And I think this is the key premise of my friend on the other side's argument, is that it's focused on one company, this company called Vanny Cambodia. It's one of a subsidiary of the constellation of broader Vanny Group companies. But that complaint doesn't indict companies. It indicts people. And the people it indicts, two of them are Cambodian officials, and six of them work at a range of different Vanny Group companies. It's not just Vanny Cambodia. It's Vanny HK, it's Vanny Group, which are two of the indicted officials, executives work at the broad Vanny Group. And so the idea that you could, even if you accept the use of the term direct, conclude that they were only talking about what was in the complaint, or the indictment, the indictment itself broadly covers a range of Vanny Group entities, including Vanny Group, which is what the complaint alleges the company knew and then told investors the opposite. Les, the floor is yours. Yes. I'm not sure why the term direct, if I were an investor and I was concerned about supply chain, the term direct to me would have an independent meaning from indirect or secondary, tertiary sources. But where you cite to the statement to the investors group where he drops the word direct, I was just curious, in the prior sentence, does he use the word correct? Direct, Your Honor? In the prior sentence at that conference. So he uses, there are two places where he uses the term direct. The first is in the, and I'm at J1110 and 1111. In the first paragraph, he uses the word direct to refer to the direct context with the supplier that the Cambodian officials are related to. He's not talking in that first paragraph, he's not talking about any of the indicted executives. He's only talking about the indicted officials. And he says, we don't have any direct contacts with that supplier. Now, I will tell you, if you read the indictment, it doesn't even refer there to a supplier related to the government officials. So it's not clear to me what he means. There's one other place where he uses the word direct, which is at the very end of the two-page transcribed interview, where he says, it's not a supplier of ours, just without distinction. And then he says, it's not directed to us. But what he's talking about there, if you look at the context, he says, so this whole thing is so new, the sort of allegations on the supplier in Cambodia was sort of dramatic. It's not a supplier of ours. It's not directed to us. What he's saying there is not we have no direct contacts. He's saying the indictment's allegations aren't directed to us. So either way, you don't get the directness the way that the company has asked the court to construe the complaint. Do you want to spend a minute on Syander? Sure, I'll spend a minute on Syander. And I think the key takeaway for Syander is that at least for the district court, it viewed Syander to largely rise or fall on whether the allegations were false or misleading. And so, you know, it held at least at a first level, you can't meet your Syander requirements because you haven't been able to show that the company knew that there was any false or misleading statements because the statements were, quote, not materially false or misleading. This is the addendum, page 32. I think if the court resolves the question whether the complaint alleges, sufficiently alleges, the statements are false and misleading, then the district court's holding on Syander also should fall. But even if that weren't the case, I think this is one of maybe those cases where, you know, there actually isn't that much dispute about what the company knew when it was making this statement. It concedes in this case, even at the complaint stage, that it knew that it was directly sourcing McCox from Vannie Supply. There are at least two subsidiary companies, part of the Vannie Group, that it was directly sourcing McCox from. And it also concedes that it was at a minimum indirectly sourcing McCox from Vannie Cambodia, the one company that it says the indictment targeted. And so either way, it knew both of those things, and yet it was making the statements that it was making. And so I think with that, it's more than enough to establish the Syander in this case. Thank you. It's sort of odd, and I don't know what to make of it. You would think of a reasonably intelligent analyst. Here's the CEO say, we have no direct suppliers that have this problem. The word direct kind of leaps out. That almost implies that he's not telling me about the indirect suppliers. How do we, if we have that observation, how does that factor into the analysis? Well, I think part of the problem is that the CEO complicated that story. So the CEO went further than just trying to cabin its connection with direct contacts. He was really, and I would encourage the court to go and read, it's two pages in the complaint, 1110 and 1111, and it's just a running transcription of the interview. And he is not drawing that distinction. And so what I think is significant is that after he gives that interview, you have multiple expert analysts who are watching this situation unfold very carefully. And what they are concluding is, oh, Charles River is totally unaffected by this collapsing Cambodian macaque supply problem. The UBS report, I think, says the company has no relationship with the indicted smuggling ring. That is the conclusion that these analysts are drawing. And so if I could just maybe just add a quote into that, in this court's decision in Johnston, you kind of had a similar situation happen where, in that case, there's a company that's meeting with the NIH regarding grants. And it gets asked a question about whether it's been interacting with the NIH, and the company says, we had no formal discussions with the NIH. Okay, and this court called that language like a cleverly crafted half-truth. I think what Your Honor is suggesting is an attempt to draw this line between direct and indirect in some ways was kind of the same thing. They are trying to craft a statement that suggests that they are unaffected, even as they know behind the scenes that they have some, at least some, maybe it's an indirect relationship. We think that's wrong even on its face because of what the indictment actually says about these companies. But even if you accept that that kind of division is technically accurate in the way the district court thought, the CEO is going a day later, goes well beyond that, and assures everybody that they're just unaffected. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the appellees please introduce themselves on the record to begin. Charles Duggan, Davis Polk, and Ward Well for appellees. May it please the court. Your Honor, I'll start with the direct versus indirect statement. And the place to begin to address that is page 109 of the joint appendix, where the complaint describes the press release and 8K that was issued by Charles River upon the unsealing of the indictment against the various individuals associated with the Bani Cambodia company. And it points out quite clearly that there is no direct contractual relationship. And it goes on to say, however, Charles River is operating under the expectation that for some period, some time period, supply of Cambodia source NHPs will be difficult to obtain in the United States. It goes on to say that the company is diligently working to mitigate any Cambodia NHP supply impact. The clear implications of that statement are that the company expects there will be some effect on it as a result of the developments involving Dang. Now, it's certainly true that a key message that it was underscoring was that it did not have direct dealings with the people engaged in the criminal activity. It isn't actually something that investors might be interested in knowing. But it's also quite clear that it is not going to be unaffected by this development. And Mr. Foster's statements later that day reinforce this point. He repeats the point that the company anticipates that for some period of time, there's going to be disruption and difficulty in getting NHPs into the U.S. We have no idea how pronounced that will be, how long it will be. And he goes on to say, obviously, we're working really hard to mitigate any potential adverse impact with other supply sources with our current supplier in Cambodia. There's a clear reference to an expectation that there will be an impact, that they are working to mitigate through accessing other sources of supply. But isn't there a difference between having a problem with your supply on the one hand and on the other hand having the problem that you're caught up in a supply chain that's prompted a federal investigation? So someone might say, these guys over here are prompting a federal regulation, federal investigation. We've got nothing to do with them. It is, though, going to create a supply chain problem for us, and we're acknowledging that. But we're not disclosing that our suppliers are themselves, or indirect suppliers are the subject of the investigation. Well, the investigations of the two companies that had received indictments, sorry, not indictments, subpoenas prior to this point was a matter of public record, had been publicly disclosed. INVIGO had actually announced that subpoenas had been received by those two companies. So that's public knowledge. Certainly. But is it public knowledge that INVIGO is a major supplier? Of Charles River? As I understand it, the employees worked for companies that were major suppliers of INVIGO, and INVIGO was then a major supplier of Charles River. It was a supplier. A substantial supplier. Your Honor, throughout this period, with the exception of the one shipment, actually of a different company unaffiliated with Manny, which is KF, which is Charles River's primary supplier, up to this point, Charles River had been receiving shipments from these various Manny-affiliated entities that had been cleared and approved by the Fish and Wildlife Service. And if you reference page 25 of the complaint, there is a chart that actually details the shipments received by Charles River from these same entities that are affiliated with the Manny group, not from Manny Cambodia, but the affiliates of Manny, that it is receiving shipments from them through this period into as late as the end of the year. In October and November, it was still receiving shipments from them. So there was no indication that Manny Cambodia's problems, while it might affect shipments coming out of Cambodia, it would result in some constraint on the supply of macaques from Cambodia. But there's no indication that the shipments of macaques that it is receiving from those related entities are not being approved and will not continue to be available to it going forward. Again, I... But this isn't like you have a warehouse in Cambodia and you just ship out. There is a six-month gestation period. And the fact that you may have gotten approved shipments in the past, as I said, it's not like ketchup bottles. There is a built-in lag time here that I do think affects this. And the argument being made is after the indictment, a series of statements were made that actually weren't true in light of the indictment and in light of some of the seizures. And Charles River knew that. So I'm not quite sure why the fact that it had gotten approved shipments up to the indictment gets you off the hook. Your Honor, they received shipments well after the indictment. Well after the indictment was unsealed. Even so? But it's an indication that there was no reason to believe that the indictment of Bani Cambodia was going to create issues for its other main source of supply, which is in no way implicated in the matters involving Bani group, which was KF. And it clearly indicated there was some expectation that there could be difficulty accessing Cambodian shipments to the extent that they were supplied by Bani Cambodia, but that they felt with their other suppliers, they would actually manage to work their way through that potential constraint. There's no indication that Charles River had any knowledge of any misconduct going on at any of these enterprises, except what was disclosed in the indictment. I don't think this is about, though perhaps discovery would show some insider information. This is about the indictment and the publicly available information and the seizure of certain shipments, right? Well, there was one, if you're referencing the shipment from KF that was not cleared in September, that action was taken. It was not altogether clear why that shipment had been stopped, whereas previous shipments had been passed through. And it's quite apparent that Charles River did not think at that time that there was going to be any general problem with importing shipments from KF, because it attempted on two subsequent occasions to bring shipments through that it expected would be cleared. And it was only after those shipments were held that it reached the determination that it would no longer import macaques from Cambodia and voluntarily suspended all imports on the basis of that development, as well as the receipt of subpoenas and an indication from the Department of Justice that it was now investigating actually KF shipments of macaques from Cambodia. And so at that point, the world was looking very, very different and Charles River goes to investors in the market and says, we're actually suspending all of our imports of macaques from Cambodia. Now, I mean, one of the ironies here is that Mr. Wessler is talking about what was not said about the Vanny Group and the suggestion that somehow Charles River distanced itself from the Vanny Group. Ultimately, the real hit to Charles River is the result of having to shut down voluntarily all imports of macaques, not from the Vanny Group, but from its primary supplier, KF Cambodia. And it's that action which causes the market to react very negatively. By the way, just to address one of Mr. Wessler's arguments about what the market knew. After Charles River went to the market on November 30th and discussed the implications of the indictment for itself, the market immediately had a negative reaction. The stock fell 5%, and the analysts who were following the company actually observed that it was working to obtain supply from other sources. Again, referencing that there was an issue presented by the concerns about Vanny Cambodia. And in fact, there was an analysis done by Jeffries. You can see this on page 116 of the complaint, which actually could compute the amount of macaques that were likely being purchased by Charles River indirectly and would therefore be affected. So the notion that the news somehow that went out on November 30th reassured investors that there would be no effects as a result of what had happened to Vanny Cambodia clearly was not how the market understood that information. Well, that could just mean it wasn't dropping as much as it would have dropped had they made a more fulsome disclosure. Well, the more fulsome disclosure would have been that there is a relation, that Vanny is a source of some macaques that ultimately wind up with Charles River. It's the knowledge of that fact that is resulting in the market decline. That much was very clearly, I would say, quite clear from Mr. Foster's own statements that they will need to mitigate the effects. So he says, as I understand it, he says that speaking of the indictment, one of the big suppliers from Cambodia who is not a supplier of ours is unable to ship, so that's going to hurt some folks. As I understand it, the truth is, is in fact that those companies associated with the indicted people were in fact the source of macaques that Charles River was getting if they were just going through another company. There were some. There were some that were coming to them through another company. So that statement, if I read supplier, it doesn't say direct supplier, if I read supplier as that's the source, that's how we're getting stuff, that statement seems to be untrue. Well, Your Honor, I think you have to, he's speaking extemporaneously at a conference. These are not written statements. But then later on he repeats it. He says it's not a supplier of ours. It's not directed to us. So it has no real short-term impact. Sorry, Your Honor. It has no short-term impact because it has sources of alternative supply, and as a matter of fact, as I mentioned before, as of this time. But that's not what he said. He didn't say it's one of our suppliers, but we've got others we can use. He says it's not a supplier of ours. He's also quite clear. Twice. Well, look, Your Honor, I think it's quite clear, taking everything that was said, that it remains to be made clear, as did the written statement, that there was no direct relationship there. And there's also. So, and you spent 10 minutes on this, but what is your argument in like one or two sentences on the no direct relationship not being misleading? That it's quite apparent that, first of all, direct means something, and it was very clearly stated that there was no direct relationship. There was no categorical statement of no relationship whatsoever, or we don't receive any macaques sourced from Cambodia, originally by Banyan Cambodia. And in fact, it's quite clear from the other statements that he's making that there is an expectation that there will be an effect on supply to Charles River that will need to be mitigated by accessing alternative sources of supply, other suppliers, and that they are working with those to mitigate the impact of the development in respect of Banyan Cambodia. And that's exactly what the analysts are reflecting in their assessment of the situation, that this is not an event that has no implications for Charles River at all. Quite the contrary. It has implications for them, and the analysts are actually saying that, and it's particularly pronounced in the Jeffries report based purely on information existing as of that time. And this was in January. That was all public data. He says, oh, you know, they get a certain amount of their macaques from this source. But some of the analysts' reports seem to reflect a view of the company that's contrary to what was going on. Your Honor, I don't think that that's... Well, I don't think that that's correct. First of all, at this time, neither Charles River nor anyone else knows what's going on with any other entity other than those that actually were subject to the indictment. There's no suggestion that any of those other affiliates were charged. And again, I would direct the Court's attention to the chart on page 25 of the complaint, which makes it very clear that the supply of macaques to Charles River throughout this period is continuous, except for the September shipment that is stopped of its own supplier, KF. And then within months of that, when further shipments are then again not cleared, it suspends all shipments from Cambodia from all suppliers out of concerns about the integrity of the market. So as soon as these events are developing, the company is actually taking action to address them and in fact is timely disclosing to the markets what it understands is the circumstance. And there is... It has no private knowledge about what is going on with these other enterprises. It is describing the implications of these public developments on itself, which it put out to the market very promptly. I want to clarify one thing. There's a reference to stock sales by senior management. Were those pre-programmed sales? There's no allegation in the complaint as to whether they were pre-programmed sales or not. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has two minutes. Yes, thank you, Matt Wessler, for the appellant. I think I'd just like to make a few brief points in rebuttal. I think you put your finger on it, which is that even if you accept everything that you just heard from my friend, I mean, it is undeniable, it's in the complaint, that after the CEO got up and made his comments, that analysts understood those comments to be telling the public that they had, and I'll just, again, just quote you one of them, quote, no relationship with either Inotive, which is Indigo and Orient, those two companies that were under criminal indictment, or the Cambodian supplier, which is Vandy Cambodia. That is the impression that this company tried to convey to investors, and there's a clear reason why it was trying to do that, which is it was trying to gain a competitive advantage between it and its competitors, and you can see this as well in the way the analysts understood what was going on, in addition to concluding that the CEO's statements and the company's statements about no direct contact, and even its statements about not using non-preferred suppliers, all led investors, analysts, after the fact to assume that it, and I'll just quote you again, this is at JA109, that Charles River could, quote, stand to benefit from this developing situation because it remained unaffected. And then at JA114, another analyst concluded, based on all this information, that Charles River was, quote, in a positive position relative to its peers. That's at JA114. And what that all tells you is that what the company was trying to do, going back to the beginning of the class period all the way up through the indictment and after is drive a wedge between it and its competitors, and convince investors and analysts that, unlike everybody else, its reliance on Cambodian macaques was high quality and had integrity and they were not going to be affected by the problems, unless the court has further questions. Thank you. Thank you, counsel. That concludes argument in this case.